# Loislaw Federal District Court Opinions

HOLEMAN v. CITY OF NEW LONDON, (Conn. 2004)

MARION HOLEMAN and WALLACE HOLEMAN, administratrixes of the ESTATE OF

DARRELL HOLEMAN, Plaintiffs, v. CITY OF NEW LONDON, ET. AL, Defendants.

No. 3:00CV1608 (DJS).

United States District Court, D. Connecticut.

August 16, 2004

### MEMORANDUM OF DECISION

DOMINIC SQUATRITO, District Judge

The administrators of the estate of Darrell Holeman, Marion Holeman and Wallace Holeman, bring this 42 U.S.C. § 1983 action against defendants the City of New London, the New London Police Department, Gasper Vincent Garcia, Bruce Rinehart, Greg Williams, and John Doe. Plaintiffs allege that defendants violated Darrell Holeman's constitutional rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs also assert claims under Connecticut law for: wrongful death; false arrest and imprisonment; assault and battery; abuse of process; conspiracy tort; negligence; and willful, wanton, and intentional conduct. Pursuant to Fed.R. Civ. P. 41, the court **GRANTS** plaintiffs' request to dismiss the City of New London Police Department and John Doe as defendants and to voluntarily withdraw the claims arising under the First and Eighth Amendments as well as the pendant state law claims of gross negligence, slander and libel, and prima facie tort. Defendants move for summary judgment **[doc. # 36]** pursuant to Fed.R. Civ. P. 56(c).

For the following reasons, defendants' motion is **GRANTED in part.**

Page 2

## FACTS

The decedent, Darrell Holeman ("Holeman"), was a citizen of the United States and a resident of the City of New London, Connecticut. Defendants, Gaspar Vincent Garcia ("Garcia") and Greg Williams ("Williams") were New London Police officers. Both Garcia and Williams graduated from the police academy and received training in criminal investigation, human relations, defensive tactics, and use of force. Garcia and Williams also received supplemental training on topics including: laws of arrest, stopping suspects, use of force, search and seizure, use of firearms, shooting decisions, and tactical weapons. Defendant Bruce Rinehart ("Rinehart") is the Chief of Police for the City of New London, a post he held at the time the events related here transpired.

During the early morning hours of August 22, 1999, Holeman and Kerri Smith ("Smith") were driving along Pequot Avenue in New London. Smith owned the car and was behind the wheel the morning in question. Officer Williams was on patrol in the Pequot Avenue area at the time. He noticed Smith's car traveling on Pequot Avenue sometime after 4:10 a.m. Pequot Avenue is an area with a comparably greater amount of criminal activity than other areas of New London. Williams followed Smith's car and viewed its maneuvers. When the car reached the intersection of Walbach Street and Howard Street, Williams observed the car hesitate and stop at a stop sign although the car did not run any stop signs or traffic lights. Williams watched the car loop around the block and decided to stop the vehicle because he believed that the car may be lost and that criminal activity was afoot.

Williams checked the car's license information and learned that it was registered in

Page 3

Groton, Connecticut. He stopped the car at 4:28 a.m. and asked the driver if she was lost. Smith said, "Yes, we're trying to find a pay phone." When Williams asked Smith who she needed to call, Smith answered, "My babysitter, I need to check on my children." Williams again asked Smith what she was doing in New London. Smith replied, "I'm trying to find a store." Williams then requested identification from both Smith and Holeman.

A second police officer, Garcia, arrived on the scene during this exchange. Garcia was accompanied by his fiancé, Consuelo Rodriguez, on an approved ride-along. Officer Garcia parked his police vehicle behind Williams' car and then joined Officer Williams.

Both Smith and Holeman presented identification to the officers. After dispatch informed the officers that Holeman was on probation for drug activity, Williams asked Smith if she had any "weapons, bombs, drugs, or dead bodies" in her car. Williams, who was standing by the driver's door, then asked Smith to step out of the car to allow him to search the car. Smith exited the car and Williams searched her person. Williams' search of Smith did not discover any weapons or contraband Plaintiffs assert that Smith did not consent to the search and that Williams mistakenly interpreted her physical act of exiting the vehicle as nonverbal consent. Defendants contend that Smith consented to the search. Smith testified that she had "agreed to let him [Williams] search my car."

After Williams searched Smith, Garcia opened the passenger door and told Holeman to exit the vehicle. Holeman stood up and faced the car. Garcia directed Holeman to place his hands on the roof of the car. The parties dispute Holeman's subsequent behavior. Plaintiffs contend Holeman complied with the officers' instructions, while defendants assert that Holeman slightly raised his hands.

Page 4

The parties agree that Garcia asked Holeman to place his hands on the roof of the vehicle a second time. The parties also agree that Holeman raised his arms to his shoulder height, placed them over the roof of the car, and said, "I'll show you what I got in my pocket." While both parties admit that Holeman moved his hand toward his front pants pocket, they dispute the timing of this motion.

Plaintiffs argue that Garcia and Williams offer differing accounts of Holeman's movements. Garcia observed that "as soon as he [Holeman] said this ["I'll show you what I got in my pocket"] he made a sudden move with his right hand toward his right front pants pocket." Williams stated that after he heard Holeman say, "'I'll give you what's in my pocket.' I [Williams] looked over and saw this guy's hands on the car but he started getting rigid, as if he were getting ready to push off or away. I saw Vinny grab this guy more firmly by the right arm I think and Vinny then said `Greg come over here.'"

The parties agree that Garcia grabbed Holeman's right arm and that Garcia called Williams for assistance. Williams joined Garcia and Holeman on the passenger side of the vehicle, where he put his left hand on Holeman's left forearm. Williams also wrapped his right arm around Holeman's head in a headlock. A physical struggle ensued, and Williams, a canine handler certified by the North American Work Dog Association, yelled for Consuelo Rodriguez to open the door to his police vehicle and release his police canine. Rodriguez opened the door and "Nero," the police canine, obeyed Williams' command and engaged Holeman.

Garcia released his hold on Holeman when Nero attacked. It is not clear why Garcia stepped away from Holeman, though he may have tripped over Nero. Plaintiffs allege that Garcia drew his weapon as he stepped back from Holeman. Garcia says that he stepped back,

Page 5

observed Holeman pull out a silver pistol, and then drew his weapon. Witness Consuelo Rodriguez also says that she saw Holeman holding a gun. While the parties agree Garcia yelled, "[h]e's [Holeman] got a gun," plaintiffs deny that Holeman possessed a gun the night in question. Plaintiffs argue that, after the shooting, Williams and Garcia initially could not find the gun and had time to plant a weapon when they were alone with Holeman. The Report of the State's Attorney found that "[t]he pistol was forensically examined for fingerprints," and "[n]o identifiable latent impressions were developed or found."

Defendants offer a different version of events as they assert that Holeman possessed a gun throughout his encounter with the officers. Williams contends that he felt a metal object during the struggle and heard Garcia say that Holeman had a gun. Furthermore, Williams says that he pushed away from Holeman after hearing Garcia's shouts. Garcia testifies that he fired his weapon because he saw Holeman point the gun at Williams' head. Garcia's shot hit Holeman. At this time, Williams, who also was wounded by Garcia's shot, fell to the ground and took cover behind the front of Smith's car. Garcia contends that he then fired two more shots because Holeman pointed the gun at him. One of these shots entered the decedent's left side, near his back.

After being shot, Holeman lowered his hands near his midsection and fell to the ground between the open passenger door and the main body of Smith's vehicle. Williams then returned to the passenger side of the vehicle. Garcia and Williams state that they could not see Holeman's hands, which were near his midsection. Williams ordered Holeman to show his hands several times. Defendants claim that Holeman did not move his hands. Williams struck Holeman in the head two or three times and commanded Nero to engage Holeman again. Garcia then saw

**Page 6**

Holeman's left hand move, so Garcia holstered his weapon and placed Holeman's left hand in handcuffs. Both Garcia and Williams moved Holeman's right arm behind his back and handcuffed the

decedent's right hand as well.

Garcia radioed his dispatcher at 4:36.45 a.m. to say that shots were fired. He called for an ambulance at 4:37:19 a.m. The scene was then declared "safe" for an ambulance. The firefighters/emergency medical technicians ("EMTs") who were dispatched to the scene provided emergency medical treatment to Holeman. Holeman arrived at L&M Hospital at 4:49:03 a.m. after being transported there by the EMTs. He died at the hospital.

Officer Williams claims that he had a "memory gap" from the time he struck Holeman to the time another officer drove him to the hospital. Neither Garcia nor Williams found a gun on the scene, however, firefighter and emergency medical technician Richard F. Burgess found a gun while he gave Holeman medical treatment. The gun he found was located next to the right rear tire of Smith's vehicle, between the tire and the curb.

## STANDARDS OF REVIEW

### 1. Summary Judgment

A motion for summary judgment turns on whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment may be granted if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 377, 323 (1986). When deciding a motion

Page 7

for summary judgment, the court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." Thomas v. Roach, 165 F.3d 137 (2d. Cir. 1999). "The burden is on the moving party `to

demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). However, the nonmovant must establish genuine issues of material fact by presenting "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d. Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper," as then there is no genuine issue of material fact. Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

2. Qualified Immunity

Defendants raise the affirmative defense of qualified immunity. "Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct." Stephenson v. Doe, 332 F.3d 68, 80 n. 15 (2d Cir. 2003). "Qualified immunity is more than a simple defense — it is 'an entitlement not to stand trial or face the other burdens of litigation, . . . an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Loria v. Gorman, 306 F.3d 1271, 1281 (2d. Cir.

Page 8

2002) (emphasis in original). "The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known." Thomas, 165 F.3d at 142.

In <u>Saucier v. Katz,</u> <u>533 U.S. 194</u> (2001), the Supreme Court established a three-step analysis for determining whether an officer is entitled to qualified immunity in excessive force cases. The first stage of the qualified immunity inquiry asks whether the facts, taken in a light most favorable to the party asserting an injury, could show a constitutional violation. <u>Saucier,</u> <u>533 U.S. at 201</u>, <u>Cowan v. Breen,</u> 352 F.3d. 756, 760 (2d Cir. 2003), <u>Loria,</u> 306 F.3d at 1281. The court proceeds with the second and third parts of the qualified immunity inquiry only if a constitutional violation could be shown on the facts.

The court next determines "[w]hether the [constitutional] right was clearly established." <u>Saucier,</u> <u>533 U.S. at 201</u>. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton,</u> <u>483 U.S. 635,</u> <u>640</u> (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." <u>Id.</u> This second step of the analysis "[m]ust be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." <u>Saucier,</u> <u>533 U.S. at 202</u>.

The court analyzes the reasonableness of the officer's conduct in the third phase of the <u>Saucier</u> test. "The relevant, dispositive inquiry in determining whether a right is clearly
Page 9
established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Id.</u> at 202, (citations omitted). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." <u>Id.</u> at 205. "Defendants will not be immune, if, on an objective basis, it is obvious that no reasonably competent officer would take the actions of the

defendant." Malley v. Briggs, 475 U.S. 335, 341 (1986). If "officers of reasonable competence could disagree," however, then "immunity should be recognized." Id.

## DISCUSSION

Plaintiffs bring this action pursuant to Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Connecticut law. "Section 1983 `is not itself a source of substantive rights,' but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (citing Baker v. McCollan, 443 U.S. 137, 144, n. 3.(1989)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Defendants move for summary judgment with respect to all counts of the complaint and raise the affirmative defense of qualified immunity.

### 1. Plaintiffs' Fifth and Fourteen Amendment Claims.

Plaintiffs improperly assert claims under the Fifth and Fourteenth Amendments. They argue that defendants violated Holeman's Fifth and Fourteenth Amendment rights to due process of law, including his right to be free from unjustified and excessive force. The Supreme Court held that such excessive force claims cannot be brought on due process grounds. Graham v.
Page 10
Connor, 490 U.S. at 395. All claims of unlawful search during the course of an arrest must be brought under the Fourth Amendment. Id. Hence, excessive force claims may only be raised under the Fourth Amendment.

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons'. . . ." Wren v. U.S., 516 U.S. 806, 808 (1996). Furthermore, "There can

be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). Additionally, a due process claim is not appropriate because this is not a case where "a state actor aided and abetted a private party in subjecting a citizen to unwarranted physical harm." Hemphill v. Schott, 141 F.3d 412, 418 (2d Cir. 1998). Nor is this case one of "[t]hose relatively unusual excessive force cases falling beyond the ambit of the Fourth and Eighth Amendments [which] are redressable only by recourse to state tort law." Id. (citing Rodriguez v. Phillips, 66 F.3d 470, 477 (2d Cir. 1995)). Plaintiffs cannot properly raise excessive force claims predicated on due process grounds under the Fifth and Fourteenth Amendments. The court grants defendants' motion for summary judgment with respect to plaintiffs' claims under the Fifth and Fourteenth Amendments.

2. Plaintiffs' Fourth Amendment Claims

Plaintiffs claim that Williams and Garcia violated Holeman's Fourth Amendment rights when the officers improperly stopped the car and searched Holeman. They also allege that the officers used excessive force during the course of the incident.

The Supreme Court has "long held that the `touchstone of the Fourth Amendment is
Page 11
reasonableness." Ohio v. Robinette, 519 U.S. 33, 39 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1996)). "A free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other `seizure' of his person" is "properly analyzed under the Fourth Amendment's `objective reasonableness' standard, rather than under a substantive due process standard." Graham, 490 U.S. at 387. The test of reasonableness "is not capable of precise definition or mechanical application." Id. at 396. In determining whether defendants violated the Fourth Amendment's

reasonableness standard, the court will apply the reasonableness test separately to the traffic stop, the search of Holeman, and the varying degrees of force the officers used against Holeman. Should the court find a possible constitutional violation with respect to the stop, search, or use of force, the court will engage in the subsequent components of the qualified immunity analysis for that potential violation.

### A. The Traffic Stop

Plaintiffs claim that the police stop of Smith's car was unconstitutional. Under the Fourth Amendment, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons. . . .'" Wren, 516 U.S. at 808; see also United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994) (citations omitted). "An automobile stop is thus subject to the constitutional imperative that it not be `unreasonable' under the circumstances." Wren, 516 U.S. at 808. Thus, a court conducting this reasonableness inquiry must look to the particular reasons the police officer stopped the vehicle and determine if the officer had reasonable suspicion or probable cause. See Id. at 809-10; Scopo, 19 F.3d at 781.
Page 12

Reasonable suspicion and probable cause are "[f]luid concepts that take their substantive content from the particular contexts in which the standards are being assessed." Ornelas v. United States, 517 U.S. 690, 696 (1996). "The principle components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." Id.

Subjective intentions play no role in this ordinary probable cause analysis. Wren, 516 U.S. at 813; see also Arkansas

v. Sullivan, 532 U.S. 769, 771-72. A police officer must "[p]oint to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). "[P]robable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" Scopo, 19 F.3d at 781 (citing U.S. v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) cert. denied, 484 U.S. 1077 (1988)).

Williams, to justify his stop, must point to specific and articulable facts that demonstrate a reasonable belief that an offense had been or was about to be committed. It is not enough, in the absence of a traffic violation, for Williams to say that he believed the vehicle was lost and that criminal activity might be afoot. Williams argues that the following particular facts provided him with probable cause to stop the vehicle: (1) the car hesitated and stopped at a stop sign; (2) after turning at the stop sign, the car proceeded on a route where it had already traveled when Williams first saw the vehicle; (3) the car, which was driving around New London, was registered in Groton, Connecticut; (4) these events occurred at approximately 4:30 a.m.; and (5) these events occurred in a high crime neighborhood. Plaintiffs do not dispute these facts.

Page 13

The court notes that these facts are strikingly similar to the facts of State v. Donahue, 251 Conn. 636 (1999). The Connecticut Supreme Court in Donahue concluded that an investigatory stop based on police observation of a legally owned vehicle driving in a high-crime neighborhood late at night was improper under Terry. The Court stated in dicta that the "general nonspecific aura of suspicion" created by the presence of a vehicle in a deserted, high-crime neighborhood did not rise to the "standard of reasonable and articulable suspicion" necessary to justify a stop. Donahue, 251 Conn. at 664 n. 10.

The court finds the factual analysis in Donahue persuasive.

The specific and articulable facts proffered by Williams, even taken together as a whole, do not establish that Williams could have had a particularized and objective basis for suspecting Smith or Holeman of criminal activity. Based on the information Williams had available at the time of the stop, a jury could find that no "objective manifestation" existed to suggest that either Smith or Holeman were engaged in or about to become engaged in criminal activity. Accordingly, there is a genuine issue of material fact as to whether the traffic stop was reasonable under the Fourth Amendment.

Since a constitutional violation could be shown, the court must proceed to the qualified immunity inquiry and ask whether the right violated was clearly established. See Saucier, 533 U.S. at 201. Reasonable minds could not disagree that the contours of the law regarding investigatory traffic stops was well-settled prior to August 22, 1999. "Except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth

Page 14

Amendment." Delaware v. Prouse, 440 U.S. 648, 663 (1979). "[Fourth Amendment] policy is not furthered by permitting police officers to stop citizens . . . simply for the well-intentioned purpose of providing directions." United States v. Dunbar, 470 F. Supp. 704, 708 (D. Conn. 1979). The law does not permit a traffic stop without a reasonable and articulable suspicion that some criminal activity is likely to occur.

The court must next decide whether "it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201. The court finds that Williams and Garcia ought to have known that the

Fourth Amendment requires more than observing a car driving through a high crime neighborhood at an odd hour to show probable cause for a traffic stop. The police may not decide to stop a vehicle based on a hunch or feeling. Nor may an investigatory stop be justified by a desire to give directions or ask questions. Officers of reasonable competence would not dispute that the facts available to Williams were insufficient to support a reasonable and articulable suspicion that Smith and Holeman were engaged in or about to partake in criminal activity. Accordingly, defendants are not entitled to qualified immunity. Defendants' motion for summary judgment with respect to this claim is denied.

### B. The Search

Plaintiffs argue that Williams and Garcia violated the Fourth Amendment's protection against unreasonable searches and seizures when the officers attempted to search the vehicle and its occupants. Plaintiffs maintain that Smith never consented to the search of the car; rather they allege that Williams mistakenly interpreted Smith's physical act of exiting the vehicle as nonverbal consent. Defendants counter that Williams and Garcia obtained Smith's consent prior to commencing the search and that the search was constitutional.

Page 15

Under the Fourth Amendment, warrantless searches are per se unreasonable "subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Consent is one such exception. Schneckloth, 412 U.S. at 218, United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995), United States v. Elliott, 50 F.3d 180, 185 (2d Cir. 1995).

Consent must be given voluntarily, Schneckloth, 412 U.S. at 222, United States v. Deutsch, 987 F.2d 878, 883 (2d Cir.

1993), by an individual whose property is to be searched or a third party who possess common authority over the premises. Elliott, 50 F.3d at 186. When deciding whether an individual consented, "[c]ourts must examine the totality of the circumstances to determine whether the consent was a product of the individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." Garcia, 56 F.3d at 422 (quoting United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993)). Consent may not be coerced. Garcia, 56 F.3d at 422. Furthermore, "[i]t is well established that knowledge of the right to refuse consent is not a requirement to a finding of voluntariness." Id. (citing Schneckloth, 412 U.S. at 231-33). Consent may be inferred "from an individual's words, acts, or conduct." Id. at 424.

If a court finds that an individual voluntarily consented, the court must next determine the scope of that consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of `objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Reasonableness is measured in objective terms by examining the totality of the circumstances.
Page 16
Robinette, 519 U.S. at 39.

Smith testified that she permitted Williams to search her vehicle. Officer Williams also testified that he acquired Smith's verbal consent to search the vehicle. There is no evidence in the record rebutting or calling into question Williams' and Smith's testimony, nor is there evidence indicating that Williams forced or coerced Smith's consent. Furthermore, Smith's act of exiting her vehicle constitutes conduct from which Williams could reasonably have inferred consent. While this evidence illustrates that Smith consented to the search of her vehicle, it does not address the scope of her consent with respect to the pat-down

searches of the vehicle's occupants.

The scope of consent is critical in this case because it is the attempted search of Holeman that raises constitutional questions in this case. Neither party has shown conclusively either that Smith limited her consent to search only the vehicle or that she agreed to a more comprehensive search that might include Holeman. Further, the record is lacking in clear proofs that might show some exigent circumstance, perhaps a threat to officer safety, that would justify the search of Holeman. The court finds that there is a genuine issue of material fact as to whether Smith's consent to search her vehicle extended to the subsequent pat-down searches.

Although defendants raise qualified immunity as to the search of the vehicle but not as to the pat-down search of Holeman, the court will assume that the defendants intended to seek qualified immunity under all circumstances. Since there is a genuine issue of material fact concerning the scope of Smith's consent, the court cannot determine whether the officers' mistake as to what the law requires was reasonable. Thus, defendants' motion for summary judgment with respect to the search of Holeman is denied.
Page 17

### C. Excessive Force

Holeman's estate alleges that Williams and Garcia used excessive force against Holeman. Plaintiffs' excessive force claims must be analyzed under the Fourth Amendment's reasonableness standard. "[T]here is no doubt that Graham v. Connor . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier, 533 U.S. at 201-202. The Graham standard requires that "[t]he `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are `objectively reasonable' in light of the facts and